IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALTRAMESIA GRADY,

    Plaintiff,

       v.                     Civil No. ELH-17-1141

RYAN D. MCCARTHY,
SECRETARY OF THE
U.S. DEPARTMENT OF THE ARMY,

    Defendant.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Altramesia Grady, who is self-represented, filed suit on April 25, 2017, against her employer, Ryan McCarthy, Acting Secretary of the United States Department of Army (the "Department," the "Agency," or the "Army"). ECF 1 ("Complaint"). She asserts claims for race, color, sex, and religious discrimination (Count I), in violation of Title VII of the Civil Rights Act of 1964, codified, as amended, at 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); retaliation (Count II), in violation of Title VII and the Rehabilitation Act of 1973, codified, as amended, at 29 U.S.C. §§ 791 *et seq.* ("Rehabilitation Act"); and hostile work environment (Count III), in violation of Title VII and the Rehabilitation Act. *Id.*

The Department has moved to dismiss or, alternatively, for summary judgment (ECF 15), supported by a memorandum of law (ECF 15-1) (collectively, "Motion") and numerous exhibits. ECF 15-2 through ECF 15-10. Purusant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the Clerk mailed a Rule 12/56 notice to Grady, advising her of her right to respond, and that failure to do so could result in dismissal of the case. ECF 18. Grady did not respond.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. Although Grady did not respond to the Motion, I shall liberally construe her Complaint, because she is self-represented. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). For the reasons that follow, I shall grant the Motion and enter judgment in favor of the Department.

## I.  Factual and Procedural Background[1]

Grady, an African-American Christian woman, works in the Department's "Directorate of Public Works Engineering Branch" in Fort Meade, Maryland. ECF 1 at 12-13, ¶¶ 4, 8, 10. She currently serves as a GS-12 General Engineer, and is "the highest-ranking African-American & female employee within Public Works Engineering Branch." *Id.* at 13, ¶ 8. Since May of 2006, Chief Engineer James Randy Williams has served as Grady's first-level supervisor. *Id.* at 13, ¶¶ 9, 10. Colonel Bert Rice served as Grady's second-level supervisor from June 2013 through June 2014. *Id.* at 13, ¶ 9; ECF 15-7 at 12. Daniel Spicer has served as Grady's second-level supervisor since Rice's departure. ECF 15-7 at 13. During plaintiff's employment with the Department, she has filed three Equal Employment Opportunity ("EEO") complaints.

### A.  2008 EEO Complaint

Shortly after joining the Department, Grady was detailed to the Meade Acquisition Team for approximately eighteen months to assist in writing a contract. ECF 1 at 9; ECF 15-2 at 3-4. On February 15, 2008, Grady filed an EEO complaint, alleging race and sex discrimination on the basis that she "was not afforded an equal opportunity to receive adequate training opportunities." ECF 15-2 ("2008 EEO Complaint"), at 3.

---

[1] As discussed, *infra*, in the context of a motion to dismiss, I must assume the truth of the facts alleged by Grady. Nevertheless, the Court may consider exhibits incorporated in or integral to the suit, and may take judicial notice of public records. And, to the extent that an issue is addressed under summary judgment standards, the facts are construed in favor of the non-movant.

On or around July 14, 2009, Grady and the Department entered into a settlement agreement. Among other things, the Department agreed to pay Grady's tuition for five college classes (not to exceed $4,200 in costs). ECF 15-5 at 3-9 ("Settlement Agreement"). In return, Grady agreed to withdraw the 2008 EEO Complaint and waive her right to pursue the accrued claims. *Id.* Accordingly, the EEO Complaint was dismissed by the Equal Employment Opportunity Committion ("EEOC"). *Id.* at 1. Grady subsequently returned to the Engineering Branch as a General Engineer. ECF 1 at 10; ECF 15-3.

## B. 2014 EEO Complaint

On or around July 15, 2014, Grady filed another EEO complaint, alleging "an ongoing continuous pattern of harassment, workplace violence, disparate treatment/impact, and retaliation/reprisal for engagement in protected activity." ECF 15-3 ("2014 EEO Complaint"), at 4. The 2014 EEO Complaint included various incidents of alleged discrimination by Grady's supervisors, which occurred between 2009 and 2014. *Id.* at 7-35. The alleged conduct generally falls into the following categories: (1) harassment by coworkers; (2) supervisors' failure to respond to alleged harassment; and (3) disparate treatment.

### i. Harassment by Coworkers

Grady alleged several incidents of harassment by her coworkers. These included the following: (1) In February 2009, Williams forwarded a "[r]acially based video showing indentured servants performing labor and on ship in water." ECF 15-3 at 7. (2) On January 30, 2014, Grady's coworker left a "Graphic photo of [a] blood sucking bug" on Grady's office chair. *Id.* at 19. (3) On March 11, 2014, during a meeting with other engineers, Williams "utilized [a] loud tone directed toward [Grady] asking how they [sic] Hell [sic] she was going to execute [the] project." *Id.* at 29. Grady was "humiliated and degraded" by such conduct. *Id.* (4) On May 28,

3

2014, Grady received "Hate Mail on [a] Government computer" from Callie Donaldson, stating that Grady was a "race card playing bitch" and that "We ALL HATE and DISRESPECT you every day." ECF 15-3 at 34.[2]

Further, Grady asserted that since 2011, her coworker, Anthony Karwoski, continuously harassed her, physically and verbally. *See id.* at 9, 14, 21. Specifically, Grady alleged that Karwoski "intentionally made reprehensible statements which are false regarding [Grady's] work assignments/projects," and he "modified [Grady's] project without her knowledge or consent. . . . [and] [a]ssaulted [Grady] physically [and] verbally without any repercussions" by Grady's supervisors. *Id.* at 21. Additionally, Grady claimed that in January 2014 she "was trapped in a corner by [Karwoski] as he verbally and physically assaulted [her] (finger within inches of [Grady's] face) . . . for approx. 5 minutes . . . ." *Id.* at 28.

### ii.    Supervisors' Failure to Respond to Alleged Harassment

Grady alleged that her supervisors failed to respond to Grady's complaints of alleged harassment during the relevant time. Specifically, Grady asserted: (1) In January 2011, Grady's supervisors "failed to take prompt action" in response to a physical and verbal threat by Karwoski. *Id.* at 9. (2) In June 2012, after Karwoski "continued to harass" Grady, her supervisors showed favorable treatment toward Karwoski and condoned his actions. *Id.* at 14. (3) On May 20, 2013, Grady's supervisors failed to respond to Grady's complaints regarding unauthorized access to her work files and other computer difficulties. *Id.* at 25. (4) In August 2013, Grady's supervisors failed to respond to Grady's reports of fraud, waste, and abuse. *Id.* at

---

[2] Grady also alleged that on May 27, 2014, she "recived [sic] hate mail" upon returning from a medical visit for stress-related symptoms. ECF 15-3 at 33. Based on the record, however, it appears that this incident refers to the email of May 28, 2014. *See* ECF 15-6 at 28-29; *see also* ECF 15-7 at 18-19.

26. (5) Grady's supervisors failed to respond to the alleged incident of January 2014, involving Karwoski. *Id.* at 28.

### iii. Disparate Treatment

Grady alleged multiple instances of disparate treatment, as follows. (1) From 2009 until 2010, Grady "was treated less favorably regarding assignment of offices. . . . [and] was not assigned an office until she complained regarding the less favorable treatment." ECF 15-3 at 8, 16. (2) From 2010 until 2014, Williams "show[ed] favor toward similar[ly] situated employees with regarding to [sic] filling managerial roles during his absence." *Id.* at 8. (3) On March 2, 2010, Grady's supervisors asked Grady to purchase a training handbook. *Id.* at 24. (4) In August or September 2010, Grady "was requested on several occasions to sign off on construction contracts [and] BG&E [contracts] for projects not assigned to her." *Id.* at 10. (5) In June 2011, Williams showed preferential treatment to white male technicians and personnel regarding project assignments and proposals. *Id.* at 11-12, 22. (6) On June 25, 2012, Grady's supervisors "[i]ntentionally hindered [Grady] from moving forward with execution" of her projects. *Id.* at 15. (7) In August 2013, Grady was penalized on her performance review in retaliation for her reports of fraud, waste, and abuse. *Id.* at 26. (8) On November 6, 2013, Williams transferred a project from Grady to Karwoski without an explanation. *Id.* at 31-32. (9) In May or June 2014, Grady's supervisors "either transferr[ed] [Grady's] assignments or consulted with male white engineering technicians regarding recommendations and request[s] submitted by [Grady]." *Id.* at 22, 30. (10) In December 2013, Grady's supervisors "lowered" Grady's performance appraisal." *Id.* at 27. Grady characterized the evaluation as "biased," and asserted that it was in "retaliation for EEO inquiry." *Id.*

Grady also alleged that she received lower pay than her fellow male engineers for equal work. *Id.* at 13. Further, she asserted that in May 2012 she declined an offer of a lateral position, because there was no increase in pay. ECF 15-3 at 13. Grady later received "an anonymous tip [in] June 2014 [that the] lateral position offered in 2012 paid sufficiently more money than what was offered." *Id.*

Moreover, Grady claims that in June of 2014, she submitted ideas through Fort Meade's Employment Innovation Program, which were subsequently implemented. *Id.* at 18. However, Grady never received an award for her proposals, which was allegedly promised by the Employment Innovation Program. *Id.* Grady also asserted that during May or June of 2014 her supervisors "consulted with male white engineering technicians regarding subsequent recommendations and request[s] submitted by [Grady]." *Id.* at 22.

### C. 2016 EEOC Hearing

The EEOC held a two-day hearing on March 23-24, 2016, before Administrative Law Judge Enechi A. Modu ("ALJ Modu"). *See* ECF 15-6 (Transcripts of March 23, 2016 and March 24, 2016).[3] Plaintiff appeared without counsel. *Id.* at 2.

During the hearing, ALJ Modu addressed Grady's claims "that [1] since August 2012 the Agency has paid Complainant at a rate less than male engineers, and that [2] her supervisor refused to process her Workers' Compensation claim on or about July 2014. July slash August of 2014." *Id.* at 9. ALJ Modu dismissed Grady's disparate pay claim after noting that Grady proffered no evidence to rebut the Department's "legitimate and nondiscriminatory reason for the difference in pay"—namely, that "some of these engineers had not been employed by the Agency for the same length of time." *Id.* at 12-13. ALJ Modu also dismissed Grady's workers'

---

[3] Unfortunately, the transcripts are filed collectively, with successive electronic pagination. The transcript for March 24, 2016, begins at ECF 15-6 at 211.

compensation claim as a "collateral attack," concluding that she would "examine[]" the supervisors' conduct in the context of Grady's harassment claim. *Id.* at 11; *see id.* at 10-12. As to the remaining claims, ALJ Modu heard testimony from Grady, her supervisors, and other individuals who worked at the Department. *Id.* at 19-392.

At a hearing on September 30, 2016, ALJ Modu rendered a comprehensive oral ruling. ECF 15-7 at 2-78. She found, *inter alia*, that Grady "ha[d] not proven by a preponderance of the evidence that the Agency unlawfully discriminated against her on the bases of her race, sex, religion, prior EEO activity, or subjected her to harassment in the terms and conditions of her employment, from March, 2013 through June, 2015." ECF 15-7 at 72-73.

On December 20, 2016, ALJ Modu issued an Order Entering Judgment in favor of the Agency. ECF 15-7 at 1.[4] A transcript of the oral ruling was attached. *Id.* at 2-4. The Agency issued its Final Action on January 19, 2017, adopting ALJ Modu's ruling and advising Grady of her right to file a civil action within ninety days of the date of receipt of the Agency's Final Action. ECF 15-8 at 1-5 ("Final Action Letter").

### D. 2016 EEO Complaint

On or about April 22, 2016, Grady filed her third EEO complaint, alleging sex discrimination and retaliation on the basis that the Department denied her telework request. ECF 15-4 ("2016 EEO Complaint"). According to her 2016 EEO Complaint, Grady initially submitted an employee telework request to Williams on October 9, 2015. *Id.* at 4. Williams denied Grady's request on or around October 22, 2015, and, after further review, Deputy Commander John Moeller denied Grady's request on or around November 13, 2015. *Id.* Spicer, Grady's supervisor, advised Grady that "the telework request would be reconsidered for 1 (one)

---

[4] In its Motion (ECF 15-1 at 4), and in the Notice of Final Action (ECF 15-8 at 1-3), the Agency stated that ALJ Modu issued judgment on September 30, 2016.

day per pay period if resubmitted." *Id.* Grady was also advised that she had used the incorrect form for her request and that the updated form would be provided to her. *Id.* at 5.

Further, Grady alleged that on or around October 22, 2015, Williams informed Grady that her request was denied because: "(a.) [Grady] has a sick child, (b.) DPW Chief Engineer [was] not sure if breathing treatments would be provided by [Grady] during telework hours, [and] (c.) [Grady] is needed onsite for meetings, inspections and, communication with contractors." ECF 15-4 at 5. Grady claimed that, despite Williams's explanation, the Agency has approved telework requests for similarly situated employees. *Id.*

On or around November 20, 2015, Grady moved to amend her 2014 EEO Complaint to include the denial of her telework request, which ALJ Modu denied on March 23, 2016. *Id.* at 6. On or around April 15, 2016, Grady received the updated telework request form from the Fort Meade EEO Specialist. *Id.* at 5. Grady resubmitted her telework request to the Agency for review on April 18, 2016. *Id.* She subsequently filed an EEOC complaint with the Fort Meade EEO on April 22, 2016. *Id.* at 1-6.

## II.     Legal Standards

### A.

"Motions to dismiss for failure to exhaust administrative remedies are governed by [Federal Rule of Civil Procedure] 12(b)(1) for lack of subject matter jurisdiction." *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 786 (D. Md. 2013) (quotation marks and citation omitted). Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Pres. Ass'n v. The Cty. Comm'rs Of Carroll Cty.*, MD, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A Rule 12(b)(1) motion should be granted "only if the material

jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Clarke*, 962 F. Supp. 2d at 786 (quotation marks and citation omitted).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "'that the jurisdictional allegations of the complaint [are] not true.'" *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted) (alteration in original); *see Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). A factual challenge can assert that facts outside the four corners of the complaint preclude the exercise of subject matter jurisdiction. *Id.*

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192. In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Id.* In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009) ("Unless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute,' the district court may . . . resolve the jurisdictional facts in dispute by considering evidence . . . such as affidavits.") (citation omitted); *Evans,* 166 F.3d at 647.

Notably, the court may take judicial notice of the existence and contents of EEOC proceedings "if necessary to decide issues like exhaustion of administrative remedies[.]" *Clarke*,

962 F. Supp. 2d at 787. But, "it may not take judicial notice of the *truth* of matters outside the challenged pleading." *Id.* (emphasis in *Clarke*).

**B.**

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, ___ U.S. ___, 135 S. Ct. 346, 346 (2014)

(per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards,* 178 F.3d at 243

(quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)).   However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009).   Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.'"   Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman* ).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger,* 510 F.3d 442, 450 (4th Cir. 2007).   However, a court may properly consider documents expressly incorporated by reference into the complaint or attached to the motion to dismiss, "'so long as they are integral to the complaint and authentic.'"   *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency,* 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009)); *see Six v. Generations Federal Credit Union*, ___ F.3d ___, 2018 WL 2435430, at *2 (4th Cir. May 31, 2018); *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *Goines*, 822 F.3d at 166; *Anand v. Ocwen Loan Servicing, LLC,* 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied,* 543 U.S. 979 (2004).

To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also consider a document submitted by the movant, even if it was not attached to or expressly incorporated in a complaint. However, the document must be "integral to the complaint" and there can be "no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).

## C.

As noted, defendant has moved to dismiss or, in the alternative, for summary judgment. A motion styled in the alternative, to dismiss or for summary judgment, implicates the court's

discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed. App'x 220, 222 (4th Cir. 2016) (per curiam). When, as here, the movant expressly captions its motion "in the alternative," as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (citations omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C ALAN WRIGHT & ARTHUR MILLER ET AL., FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed.) ("WRIGHT & MILLER). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Generally, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co.*, 637 F.3d 435, 448-49 (4th Cir. 2011) (citation omitted); *see Putney v. Likin*, 656 F. App'x 632, 638-40 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing the affidavit requirement of former Rule 56(f)). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Gordon v. CIGNA Corp.*, ___ F.3d ___, 2018 WL 2209305, at *10 (4th Cir. May 15, 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008). Moreover, if the opposing party had a reasonable opportunity to conduct discovery, a Rule 56(d) motion may be denied. *Hodgin v. UTC Fire & Security Americas Corp., Inc.*, 885 F.3d 243, 250 (4th Cir. 2018).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at her peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961); *see also Dave & Buster's, Inc.*, 616 F. App'x at 561. But, the non-moving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Risano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961). According to the Fourth Circuit, the failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is pre-mature [sic] and that more discovery is necessary," and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (quoting *First Chicago Int'l v. United Exchange Co., LTD*, 836 F.2d 1375, 1380-81 (D.C. Cir. 1988)). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Grady has not responded to the Motion. Given her lack of a response; the investigation and evidentiary hearing held by the EEOC in 2016 concerning Grady's various claims; and the fact that the claims dating to 2008 and 2009 are untimely and were otherwise the subject of a

settlement agreement, I am satisfied that further discovery would not generate a dispute of material fact. I will address portions of the Agency's Motion as one to dismiss, and other portions pursuant to summary judgment, as this will facilitate resolution of the case.

**D.**

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing

the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Moreover, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. An "unadorned opinion" of a plaintiff who alleges discrimination may be insufficient to withstand summary judgment. *See Nnadozie v. Genesis Healthcare Corp.*, ___ Fed. App'x ___, 2018 WL 1830935 (4th Cir. April 17, 2018), at *7 (distinguishing *Mackey v. Shalala*, 360 F.3d 463, 469-70 (4th Cir. 2004)). But, "extensive corroborating evidence" is not necessary to withstand summary judgment, because that "'relates only to the credibility and weight of the evidence, which are issues for *the jury*.'" *Nnadozie*, 2018 WL 1830935, at *7 (citation omitted; emphasis added in *Nnadozie*). Thus, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). In *Iraq Middle Market Development Foundation v. Harmoosh*, the Court said: "A court can grant

summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law." 848 F.3d 235, 238 (4th Cir. 2017) (citing *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)).

### III.    Discussion

The Army has advanced numerous grounds to support its Motion, including: (1) Grady failed to exhaust her administrative remedies as to several of her claims, because they were never included by her in her 2014 EEO Complaint; (2) Grady failed to exhaust her 2014 disparate treatment claims when she did not timely initiate those claims with the EEO counselor; (3) even as to claims that were exhausted, Grady has failed to state a claim because she was not subjected to any adverse employment action, nor has she shown that any conduct was based on her protected class; (4) Grady failed to set forth a *prima facie* hostile work environment claim; (5) Grady failed to set forth a *prima facie* retaliation claim; (6) the Agency has articulated a legitimate, nondiscriminatory reason for its actions, and Grady cannot establish that such reasons were pretext for discrimination; and (7) Grady is barred from relitigating the claims raised in her 2008 EEO Complaint.  ECF 15-1 at 8-27.

I address each claim below, but not necessarily in the order presented by the Department.

### A.  Title VII

Title VII prohibits discrimination "against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2; *see Young v. United Parcel Service, Inc.*, ___ U.S. ___, 135 S. Ct. 1338, 1334 (2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Del-Tile Corp.*, 750 F.3d 413, 420 (4th

Cir. 2014). Title VII also prohibits an employer from retaliating against an employee because the employee filed an earlier Charge of Discrimination. *See* 42 U.S.C. § 2000e-3(a); *see DeMasters v. Carilion Clinic*, 796 F.3d 409, 415-16 (4th Cir. 2015).

## 1. Administrative Exhaustion

Federal employees "who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult [an EEO] Counselor [in the employee's federal agency] prior to filing [an agency EEO] complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a); *see also Nielsen v. Hagel*, 666 F. App'x 225, 227 (4th Cir. 2016); *Young v. Nat'l Ctr. for Health Serv. Research*, 828 F.2d 235, 237 (4th Cir. 1987).[5] Notably, the employee "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see also Nielsen*, 666 F. App'x at 227; *Verrier v. Sebelius*, CCB-09-402, 2010 WL 1222740, at *8 (D. Md. Mar. 23, 2010).

The EEO counselor must "conduct an initial counseling session, during which the counselor must inform the aggrieved party in writing of his rights and responsibilities, and offer the employee the option of pursuing alternative dispute resolution (ADR)." *Nielsen*, 666 F. App'x at 227 (citing 29 C.F.R. §§ 1614.105(b)(1)-(2)). Counseling may lead to the withdrawal of the claim or a settlement agreement between the employee and employer. *See* 29 C.F.R. § 1614.504(a); *Campbell v. Geren*, 353 F. App'x 879, 882 (4th Cir. 2009). If the employee chooses to pursue ADR, the EEO counselor must conduct a "final interview" within

---

[5] In 1972, Congress amended title VII to provide that a federal employee who has exhausted her administrate remedies "may file a civil action as provided in Section 2000e-5 of this title" against the "head of the department, agency, or unit, as appropriate." 42 U.S.C. § 2000e-16(c); *see Bullock v. Napolitano*, 666 F.3d 281, 283-84 (4th Cir. 2012), *cert. denied*, 568 U.S. 822 (2012).

90 days of the initial interview. 29 C.F.R. §§ 1614.105(d), (f). At the end of the 90-day period, if the matter is not resolved, "the counselor must issue a written notice of right to file a formal complaint within the agency." *Nielsen*, 666 F. App'x at 227 (citing 29 C.F.R. § 1614.105(d)-(f)). Thereafter, the aggrieved party must file a formal complaint with the agency within 15 days of receipt of notice from the agency. *See* 29 C.F.R. §§ 1614.105(d), 1614.106(b).

Once the agency takes "final action" on the formal complaint, the aggrieved party may appeal the decision to the EEOC or, within 90 days, may file a civil suit. *See* 42 U.S.C. § 2000e-16; 29 C.F.R. §§ 1614.110, 1614.401, 1614.407(a); *see also Nielsen*, 666 F. App'x at 227. If an employee appeals to the EEOC, the Office of Federal Operations ("OFO") "reviews the record, supplements it if necessary, and then issues a written decision." *Scott v. Johanns*, 409 F.3d 466, 468 (D.C. Cir. 2005) (citing 29 C.F.R. § 1614.404-05). A decision by the OFO is considered to be final, "triggering the right to sue" in court. *Scott*, 409 F.3d at 468 (citing 29 C.F.R. § 1614.405(b)). Once the aggrieved party receives a "right to sue" letter, she has 90 days to file a civil action. 42 U.S.C. § 2000e-5(f)(1).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his [or her] subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). An aggrieved party who fails to comply with the applicable administrative procedures has failed to exhaust her administrative remedies and is generally barred from filing suit. *See, e.g.*, *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013); *Miles*, 429 F.3d at 491; *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). In the Fourth Circuit, where a plaintiff has failed to comply, the exhaustion requirement functions as a jurisdictional bar. In *Balas*, 711 F.3d at 406, the Court said: "[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust

administrative remedies." Thus, failure to comply generally mandates dismissal of a suit. *Lorenzo v. Rumsfeld*, 456 F. Supp. 2d 731, 734 (E.D. Va. 2006) (citing *Zografov v. Veterans Admin. Med. Ctr.*, 779 F.2d 967, 970 (4th Cir. 1985)).

The "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles*, 429 F.3d at 491; *see also Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 670 (4th Cir. 2015) ("We recognize that a primary objective of exhaustion requirements is to put parties on notice of the allegations against them."). It "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas*, 711 F.3d at 407 (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)). "Allowing [the EEOC] first crack at these cases respects Congress's intent . . . ." *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012) (quoting *Chris*, 221 F.3d at 653).

To determine whether a plaintiff has properly alleged a claim that satisfies the exhaustion requirement, courts "may look only to the charge filed with that agency." *Balas,* 711 F.3d at 408. Notably, a court cannot consider matters that were not properly raised during the EEO process. In *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297 (4th Cir. 2009), the Court said: "'Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" *Id.* at 300 (quoting *Evans*, 80 F.3d at 963); *see also Abdus-Shahid v. Mayor & City Council of Balt.*, 674 F. App'x 267, 275-76 (4th Cir. 2017); *Sydnor,* 681 F.3d at 595. Similarly, in *Evans*, the Court said, 80 F.3d at 962-63: "The allegations contained in the administrative charge of discrimination generally operate to limit the

scope of any subsequent judicial complaint." *See also Chacko,* 429 F.3d at 506 ("This charge frames the scope of future litigation.").

Thus, a plaintiff "fails to exhaust [her] administrative remedies where . . . [her] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in [the] formal suit." *Chacko,* 429 F.3d at 506; *see Nnadozie v. Genesis Healthcare Corp.,* ___ F. App'x ___, 2018 WL 1830935, at *7 (4th Cir. April 17, 2018). To be sure, courts "recognize that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality." *Balas,* 711 F.3d at 408 (citations and quotation marks omitted). But, courts are "not at liberty to read into administrative charges allegations they do not contain." *Id.* Rather, courts are constrained by the four corners of the charge and the inference of "'any charges that would naturally have arisen from an investigation thereof . . . .'" *Id.* at 407-08. But, as the Fourth Circuit recently said, "liberal construction only stretches so far." *Nnadozie*, 2018 WL 1830935, at *7.

Nevertheless, "an administrative charge of discrimination does not strictly limit a Title VII suit which may follow. Instead, so long as a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, she may advance such claims in her subsequent civil suit." *Sydnor,* 681 F.3d at 594 (internal citations and quotations omitted). As the *Sydnor* Court said: "The touchstone for exhaustion is whether plaintiff's administrative and judicial claims are 'reasonably related,' . . . not precisely the same . . . ." *Id.* at 595 (citation omitted); *see also McCray,* 662 F. App'x at 224; *Jones v. Southpeak Interactive Corp. of Del.,* 777 F.3d 658, 669 (4th Cir. 2015); *Jones,* 551 F.3d at 300; *Evans,* 80 F.3d at 963.

Here, the Army contends that several of Grady's claims did not appear in any of her EEO Complaints, and therefore such claims must be dismissed. Specifically, the Department asserts that Grady failed to exhaust her claims that: (1) since May 2006, Williams "treated her differently (less favorably) in comparison to similarly situated employees (male engineers) and has referred to her as a 'trouble maker.'" ECF 1 at 9, ¶ 10; (2) In October 2013, Grady's supervisors refused to engage in third-party intervention. *Id.* at 10; (3) On March 18, 2014, Grady emailed Williams "regarding his continued harassment and abrasive behavior towards her and he refused to acknowledge the [March 11, 2014] incident 'stating he did not know what the plaintiff was talking about.'" *Id.* at 14, ¶ 21; (4) On December 15, 2014, Grady "was subjected to retaliation and harassment when [] Williams . . . referred to her as a 'trouble maker and advised other engineers to stay away from her.'" *Id.* at 15, ¶ 27; (5) In June of 2015, the Department "repeatedly failed to take action when plaintiff reported she was being harassed by contractor when he intervened and undermined her current project (task)." *Id.* at 15, ¶ 31; (6) The Department "punished [Grady] for using medical leave to obtain treatment for work induced maladies." *Id.* at 11; (7) In September 2016, Grady's "supervisor isolated her . . . by excluding her from meetings, [and] denying her to attend training." *Id.*; and (8) Williams denied plaintiff's telework request "when similar[ly] situated male engineers were approved to telework." *Id.*

Upon review of the record, I am satisfied that Grady administratively exhausted her claims that she was the subject of race and sex discrimination and retaliation because of her supervisors' failure to respond to alleged harassment. *See* ECF 1 at 14, ¶ 21; *id.* at 15, ¶ 31; *id.* at 10. Although Grady's 2014 EEO Complaint did not specifically include incidents that took place in October 2013, March 18, 2014, or June 2015, Grady alleged throughout the administrative investigation that her supervisors failed to address known harassment from

January 2011 until June 2015. In her 2014 EEO Complaint, Grady checked the boxes for race, sex, and reprisal, and included a memorandum detailing various incidents of alleged discrimination. ECF 15-3.

Notably, in her memorandum, Grady alleged several instances of disparate treatment on the basis of race, sex, and reprisal, including, in relevant part, that her supervisors repeatedly failed to respond to her complaints of harassment by her coworkers during the relevant time. *See, e.g.*, *id.* at 9 (alleging that in January of 2011, Grady's supervisors "failed to take prompt action regarding the reprehensible physical & verbal attack [Grady] suffered from"); *id.* at 14 (alleging that in June 2012, "DPW Chf Engineer condones SAIN Contractor actions (i.e. work place violence, insubordination, libel, harassment of complainant)"); *id.* at 15 (alleging that on June 25, 2012, "Williams did not respond when [Grady] notified him she was physically and verbally attacked by SAIN Contractor January 2011."); *id.* at 19-20 (alleging that on January 30, 2014, "Chf Engineer failed again to resolve issue [related to a photo of a bug left on Grady's chair]."); *id.* at 21 (alleging that in March of 2014, Grady's supervisors failed to hold her coworker accountable for alleged harassment and workplace violence); *id.* at 25 (alleging that on May 20, 2013, Grady's supervisors did not "assist or inquire with [Grady] regarding reocurring [sic] computer issues"); *id.* at 26 (alleging that in August of 2013, Grady's supervisors "failed to take prompt action when [Grady] notified them regarding alleged fraud, waste, & abuse."); *id.* at 28 (alleging that in January of 2014, Grady's supervisors failed to respond to Grady's complaints of harassment and workplace violence).

Additionally, during the administrative hearing, ALJ Modu noted that Grady alleged that, "[f]rom March 2013 through November 2014, [Grady's supervisors] repeatedly failed to resolve and prevent numerous computer-related errors," and she claimed that "the Agency retaliated

against her and subjected her to harassment . . . on or about June 2015, [when] the SEIN contractor informed [Grady] of the Energy Manager contractor's verbal threats to undermine current tasks of [Grady]."  ECF 15-6 at 5-6.  ALJ Modu's decision also addressed Grady's various claims, including that "on March 18, 2014 [Grady] sent an e-mail to Williams to which he did not respond," ECF 15-7 at 7, and that "on December 15, 2014 [Grady's] supervisor directed other employees to stay away from [Grady]."  *Id.* at 8.

Grady's judicial claims—specifically, that her supervisors failed to respond to incidents in October of 2013, on March 18, 2014, or in June of 2015—are reasonably related to the administrative claims set forth in the 2014 EEO Complaint.  First, Grady's allegations in the suit involve "the same place of work and the same actor[s]" as the 2014 EEO Complaint.  *See Sydnor*, 681 F.3d at 595.  Like Grady's 2014 EEO Complaint, the Complaint alleges that Grady's supervisors, including Williams, repeatedly failed to respond to her reports of ongoing harassment during her employment at the Department.  *Compare* ECF 1 at 9-16 *with* ECF 15-3.  Thus, Grady's case against the Agency "d[oes] not involve shifting sets and a rotating cast of characters that would have deprived her former employer of notice of the allegations against it."  *Sydnor*, 681 F.3d at 595 (citing *Chacko*, 429 F.3d at 511).

Moreover, Grady's administrative and judicial claims relate to the same types of alleged discrimination.  Grady's Complaint contains allegations of discrimination on the basis of race, sex, color, religion, and reprisal for prior EEO activity, which were addressed by the administrative investigation.  *See* ECF 15-8 ("You claimed that you were the victim of discrimination and subjected to harassment based upon race (African American), color (brown), sex (female), Religion (Christian), and reprisal for prior EEO activity . . . .").  Thus, Grady

administratively exhausted her disparate treatment claims related to her supervisors' failure to respond to Grady's complaints from January 2011 until June 2015.

Grady has also exhausted her claims that she was subject to disparate treatment and harassment because her supervisors advised coworkers to "stay away" from Grady and referred to her as a "trouble maker." *See* ECF 1 at 13, ¶ 10; *id.* at 15, ¶ 27. In addition to involving the same actors and alleged discrimination as set forth in the 2014 EEO Complaint, these allegations were included and addressed by ALJ Modu during the administrative hearing. *See* ECF 15-6 at 6, 45. Moreover, the Agency's Final Action Letter recognized Grady's allegation that her supervisor "directed other employees to stay away from [her] . . . ." *See* ECF 15-8 at 2. Given that the administrative investigation considered Grady's allegations that her supervisors advised employees to "stay away" from Grady and referred to her as a "trouble maker," Grady administratively exhausted these claims. *See Sydnor*, 681 F.3d at 594.

The record, however, does not reflect that Grady ever amended her EEO complaint to include her allegations that Grady's supervisors excluded her from meetings and trainings or that the Army punished Grady for using medical leave. Moreover, the 2014 EEO Complaint, as well as the related investigation, did not include Grady's claims of sex discrimination and reprisal because of her supervisors' denial of her telework request. The record does not demonstrate, and Grady does not contend, that the 2016 EEO Complaint has resulted in any final action related to the denial of Grady's telework request.

Thus, Grady failed to administratively exhaust her claims that her supervisors excluded her from meeting and trainings, that the Department punished Grady for using medical leave, and that Grady's supervisors improperly denied her telework requests.

## 2. Timeliness

The Department contends that several of Grady's 2014 disparate treatment claims were not timely initiated with the EEO and therefore must be dismissed. ECF 15-1 at 9-11. Specifically, the Department argues that, because Grady's initial contact with the EEO counselor was on April 25, 2014, Grady failed to timely initiate all disparate treatment claims that occurred prior to March 11, 2014, including the following: (1) From 2009 until 2010, the Department failed to assign Grady an office that was similar or equal to the offices of her co-workers. ECF 1 at 13, ¶ 11. (2) In January 2011, Grady's supervisors failed to respond to Grady's reports of Karwoski's alleged harassment. *Id.* at 13, ¶ 12. (3) In 2011, Grady was treated less favorably as to her request to purchase a training book. *Id.* at 13, ¶ 13. (4) On November 6, 2013, Grady's supervisor transferred her project to Karwoski. *Id.* at 14, ¶ 15. (5) In November 2013, Grady's supervisors gave her a lower performance rating. *Id.* at 14, ¶ 16. (6) On January 30, 2014, Grady's supervisors failed adequately to respond to an incident involving a photo of an insect placed on Grady's chair. *Id.* at 14, ¶ 17. (7) On February 2, 2014, Grady's supervisors failed to respond to her emails. *Id.* at 14, ¶ 18. (8) On March 10, 2014, Grady was subjected to harassment by Karwoski and her supervisors failed to respond. *Id.* at 14, ¶ 19. (9) Since August 2012, Grady was paid less than male engineers. *Id.* at 15, ¶ 32. *See* ECF 15-1 at 10.[6]

As previously noted, a federal employee "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see also Nielsen*, 666 F. App'x at 227; *Verrier*, 2010 WL 1222740, at *8. Failure to comply generally "mandates dismissal, unless the plaintiff provides evidence that (1) [she] was unaware

---

[6] The Department also contends that this Court should dismiss Grady's claim related to the denial of her telework requests on the basis that Grady failed to timely initiate her claim with the EEO counselor. *See* ECF 15-1 at 10. Because Grady failed to exhaust this claim through the applicable administrative procedures, I need not address the Department's timeliness argument.

of the time limits for contacting an EEO counselor, or (2) the government engaged in affirmative misconduct in relation to the plaintiff seeking counseling." *Verrier*, 2010 WL 1222740, at *8 (citing *Lorenzo*, 456 F. Supp. 2d at 734, and 29 C.F.R. § 1614.105(a)(2)).

Grady has not alleged that she was unaware of the 45-day time limit, or that the Department engaged in any misconduct related to the matter of counseling. Indeed, it appears that Grady was at least somewhat familiar with the administrative process after filing her 2008 EEO Complaint. These circumstances, then, do not resemble "those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party . . . ." *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000).

Accordingly, I conclude that Grady failed to timely initiate any disparate treatment claims that allegedly occurred prior to March 11, 2014, including her claims regarding her office assignment from 2009 until 2010; her supervisors' failure to respond to alleged harassment in January 2011, in January 2014, in February 2014, and on March 10, 2014; her supervisors' response to Grady's request for a training book in 2011; her supervisors' decision on November 6, 2013, to transfer Grady's project to another employee; and Grady's lower performance rating in November of 2013.

However, Grady did not fail to timely initiate her disparate treatment claim regarding unequal pay. "Failure to pay equal wages is a continuing violation, so that limitations do not begin to run until the last day of unequal pay, not the first." *Grove v. Frostburg Nat. Bank*, 549 F. Supp. 922, 939 (D. Md. 1982) (citing *Jenkins v. Home Ins. Co.*, 635 F.2d 310, 312 (4th Cir. 1980)); *see also Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 346 (4th Cir. 1994) ("Our cases demonstrate . . . that in a compensation discrimination case, the issuance of each

diminished paycheck constitutes a discriminatory act."); *Jenkins*, 635 F.2d at 312 (finding a continuing violation in the plaintiff's continued receipt of paychecks throughout the course of the plaintiff's employment).

Grady filed the 2014 EEO Complaint while she remained employed at the Department and still receiving allegedly unequal pay. In her Complaint, Grady alleged that she was paid less than male engineers "*since* August 2012." ECF 1 at 15 ¶ 32 (emphasis added). Thus, contrary to the Department's argument, Grady's unequal pay claim was timely initiated and therefore administratively exhausted.

### B. Proof of Discrimination

In general, there are "two avenues" *at trial* by which a plaintiff may prove a violation of Title VII and other employment discrimination statutes. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc) (recognized in *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015), as *abrogated on other grounds by Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)); *see Love–Lane v. Martin,* 355 F.3d 766, 786 (4th Cir. 2004) (stating that "the *McDonnell Douglas* framework, developed for Title VII, has been used to evaluate race discrimination claims under the three statutes," *i.e.,* Title VII, § 1981, and § 1983); *see also, e.g.*, *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x 146, 152 (4th Cir. 2017) ("Retaliation claims can be proven by two avenues: one path looks to direct or circumstantial evidence of discriminatory motive while the other proceeds under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green* . . . ."); *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 263 n.* (4th Cir. 2008) ("[T]he *McDonnell Douglas* framework applies to discrimination claims under...§ 1981.").

The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young v. United Parcel Serv., Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1345 (2015) (construing the Pregnancy Discrimination Act); *Guessous*, 828 F.3d at 216 (discussing the three steps of the *McDonnell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action,"

then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At the motion to dismiss stage, or on summary judgment, these approaches merely serve to inform a court's evaluation of the allegations or the evidence. *Cf. Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").

In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." The Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 1162 (2016).

The Second Circuit has observed that the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal* and *Twombly*. *See Littlejohn v.*

*City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent." *Id.* at 309. On the other hand, in *Twombly*, the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of *Twombly* is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), *cert. denied sub nom. City of Greensboro, N.C. v. BNT Ad Agency, LLC*, —— U.S. ——, 138 S.Ct. 558 (2017), the Fourth Circuit clarified that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies." At the motion to dismiss stage, the question is whether plaintiff has stated "a plausible claim for relief under Title VII . . . ." *Ciociola v. Baltimore City Bd. of Sch. Comm'rs*, CCB-15-1451, 2016 WL 125597, at *4 (D. Md. Jan. 12, 2016).

There is no direct evidence of discrimination in this case. Therefore, where appropriate, I will evaluate Grady's allegations in light of the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.").

Despite Grady's *pro se* status, in order to survive a motion to dismiss, she "must still make 'a plausible claim for relief.'" *Jackson v. Convergent Outsourcing, Inc.*, RDB-13-1755, 2014 WL 722116, at *1 (D. Md. Feb. 25, 2014) (citing *Ibqal*, 556 U.S. at 678). And, to the

extent I address any claims under summary judgment principles, the *McDonnell Douglas* framework will serve merely as a guide in the analysis.

### C. Disparate Treatment

The Department challenges Grady's disparate treatment claims for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 15-1 at 11-15.

To assert a disparate treatment claim, Grady must allege: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012).

As to the first and second elements, there is no dispute that Grady is a member of a protected class and that her job performance was satisfactory. *See* ECF 15-1 at 11-15. Rather, the motion turns on the third element: whether Grady alleged an adverse employment action. *Coleman*, 626 F.3d at 190; *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).

An "adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 598 (D. Md. 2011) (quoting *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007)). Of import here, an adverse employment action "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). The plaintiff "'must show that a reasonable employee would have found the challenged action materially adverse' . . . ."

*Hoyle*, 650 F.3d at 337 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

A "'downgrade of a performance evaluation *could* effect a term, condition, or benefit of employment' if it has a tangible effect on the terms and conditions of employment." *Booz-Allen & Hamilton, Inc.*, 368 F.3d at 377 (citation omitted) (emphasis in original). However, "[a]n action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of her employment, is not an adverse employment action." *Spriggs v. Pub. Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 393 (D. Md. Apr. 17, 2002) (citations omitted). Moreover, "an employee's dissatisfaction with this or that aspect of work does not mean an employer has committed an actionable adverse action." *Booz-Allen & Hamilton, Inc.*, 368 F.3d at 377; *see also Moret v. Green*, 494 F. Supp. 2d 329, 344 (D. Md. 2007) (stating, in part, that an employer's refusal to give the plaintiff a new computer did not amount did not amount to a materially adverse employment action); *Mascone v. American Physical Sec., Inc.*, Civil Case No. RWT-07-966, 2009 WL 3156538, at *6 (D. Md. Sept. 25, 2009) (concluding that the plaintiff failed to establish a *prima facie* case of disparate treatment when the plaintiff's allegations included that "she was blamed for and not provided support in connection with a disciplinary situation . . . , had computer equipment taken from her, received criticism for her procurements, was directed to change her management style . . . , and was instructed to look for 'mothers with children' to fill a vacancy . . . .") (internal quotation marks omitted).

Grady contends that she suffered adverse employment actions when: (1) Williams, "in the presence of other engineers[,] yell[ed] in an abrasive tone 'How in the hell are you going to execute the project' during a meeting" on March 11, 2014, ECF 1 at 14 ¶ 20, and referred to Grady as a "'trouble maker and advised other engineers to stay away from her.'" *Id.* at 15 ¶ 27;

(2) Grady's supervisors failed to respond to her emails and complaints of harassment. *Id.* at 14-15 ¶¶ 21, 31. (3) Williams did not select Grady as Acting Chief Engineer during his absence. *Id.* at 14 ¶ 24. (4) The Agency paid Grady at a rate less than it paid male engineers. *Id.* at 15 ¶ 32.

For the most part, such conduct does not qualify as adverse employment actions. And, in any event, these claims fail.

### i.

Williams's verbal reprimand on March 11, 2014, did not constitute an adverse employment action. Verbal reprimands "do not automatically constitute adverse employment actions, as they do not always affect the terms and conditions of employment." *Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 586 (D. Md. 2002) (citation omitted); *see also Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 428-29 (4th Cir. 2015) (holding that, for the purposes of a Family Medical Leave Act claim, "neither the written nor the verbal reprimands qualify as adverse employment actions, because they did not lead to further discipline.") (citations omitted); *Munday v. Waste Mgmt. of N. America, Inc.*, 126 F.3d 239, 244 (4th Cir. 1997) (holding that an employer's "yelling at [the plaintiff] during [a] meeting" did not rise to the level of an adverse employment action for Title VII purposes); *Finnegan v. Dep't of Pub. Safety & Corr. Servs.*, 184 F. Supp. 2d 457, 461 (D. Md. 2002) ("Such discipline, without evidence that the verbal reprimands or that a counseling letter could lead to further disciplinary action, such as termination, does not constitute an adverse employment action."). Indeed, "such an automatic rule would inhibit criticism and communication between supervisors and employees." *Chika*, 179 F. Supp. 2d at 586 (citation omitted).

Grady has offered no allegations concerning the effect of Williams's verbal reprimand on the terms or conditions of her employment. Nor has she suggested that the reprimand was even

documented in her personnel file. *See id.* at 587. Thus, Grady's claim related to Williams's reprimand during the March 11, 2014, meeting must fail as a matter of law.

Moreover, Williams's reference to Grady as a "trouble maker," and his "advis[ing of] other engineers to stay away from" Grady, cannot constitute an adverse employment action under Title VII. It is well established that "ordinary workplace strife . . . cannot constitute adverse employment action." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 272 (4th Cir. 2001); *see also Roberts v. Saint Agnes Hosp.*, GJH-13-3475, 2015 WL 3932398, at *8 (D. Md. 2015) ("[M]ere insults that do not have a tangible effect on the terms and conditions of employment do not amount to an adverse employment action."). *Munday*, 126 F.3d at 243.

The Fourth Circuit's decision in *Munday*, 126 F.3d 239, is instructive. In that case, the Fourth Circuit considered whether the plaintiff suffered an adverse employment action when her supervisor's conduct included "yelling at [the plaintiff] during [a] meeting, directing other employees to ignore her and to spy on her, and generally refusing to communicate with her concerning her employment-related complaints . . . ." *Id.* at 243. The Fourth Circuit concluded that the employer's conduct did not constitute an adverse employment action for Title VII purposes. *Id.* The Court said: "In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in a protected activity." *Id.*

Like the employer's conduct in *Munday*, Williams's alleged actions simply do not rise to the level of an adverse employment action. Grady has not alleged that she suffered any effect on the terms, conditions, or benefits of her employment, such as a decrease in compensation, job title, level of responsibility, or opportunity for promotion. *Cf. Boone v. Goldin*, 178 F.3d 253 (4th Cir. 1999) (declining to find an adverse employment action where the plaintiff "did not

allege discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion-the typical requirements for a showing of an 'adverse employment action' that can support a Title VII claim") (citing *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981)).  Rather, Grady asserts only that Williams's actions "w[ere] condescending, demeaning and stressful[,] bringing her to tears in front of her peers and subjecting her to public ridicule during meetings."  ECF 1 at 12.  Allegations of stress, however, are insufficient to amount to an adverse employment action for the purposes of Title VII.  *See Boone*, 178 F.3d at 255-56.

Accordingly, Grady has failed to state a claim for disparate treatment related to Williams's verbal reprimand, the reference to Grady as a "trouble maker," or the instruction to other employees to avoid Grady.  Although these allegations fail to state a claim for disparate treatment for Title VII purposes, this Court will consider these allegations in the assessment of Grady's hostile work environment claim, *infra*.

### ii.

Grady also asserts a disparate impact claim based on her supervisors' failure to respond adequately to her complaints of computer issues and harassment.  In particular, Grady refers to Williams's "refus[al] to acknowledge the [March 11, 2014] incident 'stating he did not know what the plaintiff was talking about'" in response to her email of March 18, 2014  [ECF 1 at 14, ¶ 21]; her supervisors' "fail[ure] to resolve ongoing systemic computer issues that has [sic] hindered plaintiff with regards to assignments," *id.* at 15, ¶ 25; her supervisors' failure to resolve an incident "when [Grady's] computer was modified to reference 'NAE//: prayer ready,'" *id.* at 15, ¶ 26; and the Agency's "repeated[] fail[ure] to take action when plaintiff reported she was

being harassed by contractor when he intervened and undermined her current project (task)." *Id.* at 15, ¶ 31. Again, such actions do not rise to the level of adverse employment actions.

As indicated, Williams allegedly refused to acknowledge the meeting of March 11, 2014. At the administrative hearing, Grady testified that she "d[idn't] understand why [Williams] had no idea [what her March 18, 2014 email referenced], and he was oblivious to his actions when [Grady] inquired of him via e-mail." ECF 15-6 at 26. Although Grady conceded that Williams responded to her March 18, 2014 email, she stated that Williams "acted like he didn't know what [she] was talking about. . . . [l]ike he always do [sic]." *Id.* at 27-28.

Grady has not alleged any negative effect on the terms, conditions, or benefits of her employment; Grady has not alleged that Williams's failure to acknowledge the March 11, 2014 meeting affected her, beyond causing mere surprise or disappointment. *See Blount v. Morgan Stanley Smith Barney LLC*, 982 F. Supp. 2d 1077, 1082 (N.D. Cal. 2013) ("As a general matter, lack of contact with an employee or co-worker does not constitute adverse employment action.") (citing *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1090 (9th Cir. 2008)). Absent any effect on the terms, conditions, or benefits of her employment, Williams's alleged failure to respond adequately to Grady's email cannot constitute an adverse employment action under Title VII.

In her Complaint, Grady also alleged that her supervisors "failed to resolve ongoing systemic computer issues that has [sic] hindered plaintiff with regards to assignments." ECF 1 at 15, ¶ 25. Specifically, she alleged that, following her 2008 EEO Complaint, she began to experience "technical issues," such as her computer "stating that [her] files are currently in use by another user or [her] files have been updated." ECF 15-6 at 43. Additionally, Grady alleged that "her computer was modified to reference 'NAE//: prayer ready.'" ECF 1 at 15, ¶ 26. Although Grady testified that her supervisors "repetitively informed [her] to submit trouble

tickets" with the IT Department to resolve her computer issues, ECF 15-6 at 42, Grady contends that the Department's ultimate failure to resolve her computer issues was discriminatory.  ECF 1 at 15, ¶¶ 25-26.

The Department's failure to resolve Grady's computer issues does not constitute an adverse employment action.  Even assuming that the Department intentionally failed to resolve Grady's computer issues, Grady only alleges that the Department's conduct "hindered [her] with regards to assignments."  *Id.* at 15, ¶ 25.  As set forth earlier, however, such inconvenience does not rise to the level of adverse employment actions under Title VII.

Finally, Grady alleged that in June 2015 her supervisors "repeatedly failed to take action when plaintiff reported she was harassed by [a] contractor when he intervened and undermined her current project (task)."  ECF 1 at 15, ¶ 31.  Based on the record, it appears that Grady refers to an incident where, "on or about June, 2015, the SAIN contractor informed [Grady] of the energy manager contractor's verbal threats to undermine current tasks of [Grady]."  ECF 15-7 at 75; *see also* ECF 15-6 at 62-63 (Grady's testimony, including that "on or about June 2015, we, which we discussed the same contactor [sic] informed, informed Complainant of the Energy Manager's verbal threats.").

This Court is unable to ascertain what Grady intended to allege.  But, such vague allegations are insufficient to support a claim for disparate treatment under Title VII. Accordingly, Grady's disparate treatment claim regarding her supervisors' failure to respond to Grady's complaints of computer issues and harassment are subject to dismissal.

Although these allegations fail to state a claim for disparate treatment for Title VII purposes, I will consider these allegations in the assessment of Grady's claim of a hostile work environment.

### iii.

Grady also asserts a disparate impact claim regarding Williams's failure to select Grady as Acting Chief Engineer. I shall review this issue under the summary judgment standard.

In a failure to promote case, the Fourth Circuit has said that, to establish a *prima facie* case of discrimination under Title VII, the plaintiff must show by a preponderance of the evidence that: (1) she is a member of a protected class; (2) her employer had an open position for which she applied or sought to apply; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Evans*, 80 F.3d at 959-60 (citing *Burdine*, 420 U.S. at 253; *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994); *McNairn v. Sullivan*, 929 F.2d 974, 977 (4th Cir. 1991)).

Clearly, Grady has satisfied the first and third criteria. It is less clear, however, whether Grady ever applied or sought to apply to be selected as Acting Chief Engineer. Nor is it clear that any particular benefits are associated with the temporary position, beside, perhaps, some prestige. Although Grady stated that she "specifically identified that [she] wanted greater leadership detail, and [Williams] was aware of that," ECF 15-16 at 58, there is no indication that Grady ever explicitly expressed her interest in serving as Acting Chief Engineer until she filed her 2014 EEO Complaint. *Id.* at 58-59. Indeed, Williams stated that he "didn't know [Grady] wanted to serve in that capacity . . . ." *Id.* at 217. Nonetheless, I shall assume that Grady can establish a *prima facie* case that she sought but was rejected for the position of Acting Chief Engineer.

Notably, "[i]n a failure to promote case, the plaintiff must establish that she was the better qualified candidate for the position sought." *Evans*, 80 F.3d at 960. An employer "has

42

discretion to choose among equally qualified candidates provided the decision is not based upon unlawful criteria." *Wileman v. Frank*, 979 F.2d 30, 38 (4th Cir. 1992).

During his absences, Williams selected several different employees to serve as Acting Chief Engineer, including Bill Baum, Assaf Dvir, Paul Sylvestre, and Sam Sawgeid. ECF 15-6 at 217, 272. At the EEOC hearing, Grady established that she was "offered" the "opportunity" to serve as Acting Chief Engineer on November 28, 2014. *Id.* at 217. But, she asked Williams why she was not selected to serve as Acting Chief Engineer prior to that date. Williams testified, *Id.*:

> Two real basic reasons. One is I didn't know you wanted to serve in that capacity because it is an extra duty, and some people don't want it. The other is that because of your FMLA and your daughter's health condition, it was unclear from day-to-day whether you would be able to report for work.

Moreover, when Williams was asked how Grady's background differed from the backgrounds of those selected to serve as Acting Chief Engineer, he explained that Grady "came to [the Agency] as an intern and her work while an intern was primarily in energy management, and she had not done the extent of project preparation, project investigation, engineering calculations that several of the others had who had more experience." *Id.* at 281. He also stated that he was "not aware of [Grady] having background experience in management or anything like that." *Id.* at 277.

In response to whether those selected as Acting Chief Engineer possessed any qualities that Grady did not possess, Williams testified that he selected Baum as Acting Chief Engineer because he worked at the Department for "about 30 years or more" and he "knew a lot of people at Fort Meade, and he knew DPW processes and how to get something done." *Id.* at 273. Additionally, Williams testified that he selected Dvir as Acting Chief Engineer because he had approximately 30 years of government experience, was a registered professional engineer, and "knew lots of people at Fort Meade that he could go to for help if he needed it." *Id.* Williams

testified that he selected Sylvestre to serve as Acting Chief Engineer because of "[t]he primary length of experience and his knowledge of how our contracts work and the people at Fort Meade," as well as "[t]he ability to handle a situation that might come up without a lot of difficulty." *Id.* at 274. Finally, Williams stated that Sawgeid had previously worked at other public works agencies and "would have known how the [Agency] works and how engineering work goes." *Id.* at 280. When asked whether he considered seniority in selecting an Acting Chief Engineer, Williams responded that he considered seniority "[o]nly to the extent that [he] wouldn't ask somebody who was a GS-9 or lower than a 12 to fill in for [him]." *Id.*

Grady appears to rely largely on her bald contention that those selected as Acting Chief Engineer lacked experience and seniority and, therefore, were not better qualified for the position. *See* ECF 1 at 14, ¶ 24. However, she has offered no evidence to suggest that Williams's explanation for her non-selection was mere pretext. For example, Williams noted that Grady had less experience in "project preparation, project investigation, [and] engineering calculations," as well as no known "background experience in management." *See* ECF 15-6 at 277, 281. Grady has failed to demonstrate that she was better qualified for the position of Acting Chief Engineer than Baum, Dvir, Sylvestre, or Sawgeid.

### D. Hostile Work Environment

The Department contends that Grady cannot establish a claim for hostile work environment. First, the Department argues that Grady cannot show that the alleged harassment occurred because of her protected class. ECF 15-1 at 15-16. Second, the Department contends that, even if the alleged harassment occurred because of Grady's protected class, the conduct was not sufficiently severe or pervasive to alter the conditions of Grady's employment. *Id.* at 16-19.

A hostile work environment exists under Title VII when the "'workplace [is] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment.'"

*Boyer-Liberto*, 786 F.3d at 281 (quoting *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 339 (4th Cir. 2006)) (some quotations and citation omitted); *see Harris*, 510 U.S. at 21; *Nnadozie*, *supra*, 2018 WL 1830935, at *5.

To state a *prima facie* claim for hostile work environment under Title VII, the plaintiff must allege that there was: "'(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race[, color, sex, religion, or protected activity]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)); *see Nnadozie*, 2018 WL 1830935, at *5.

Hostile work environment claims may occur "over a series of days or perhaps years . . . ." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Thus, for hostile work environment claims, "[i]t does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* at 117. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* Therefore, this Court will consider all of the allegations set forth in Grady's Complaint, including those incidents that occurred prior to March 11, 2014.

To satisfy the second element of a hostile work environment claim, the plaintiff must demonstrate that she was harassed or otherwise discriminated against "because of" her protected class. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (citing *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 142 (4th Cir. 1996)). The plaintiff may satisfy this burden by showing that, "but for" her protected class, she would not have suffered

discrimination. *Id.* To be sure, "harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [the plaintiff's protected class], manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008)).

As to the third element of a hostile work environment claim, the Fourth Circuit has stated that the plaintiff must show that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22). However, the plaintiff does not need to demonstrate that the work environment is "psychologically injurious." *Id.* And, "[w]hether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale*, 523 U.S. at 81); *see Nnadozie*, 2018 WL 1830935, at *6. In evaluating the evidence on summary judgment, it is appropriate to consider "'all the circumstances, . . . including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 23) (other quotations and citations omitted); *see Nnadozie*, 2018 WL 1830935, at *6.

The determination "'is not, and by its nature cannot be, a mathematically precise test.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Moreover, "[n]o single factor is dispositive, as [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Harris*, 510 U.S. at 23, and *Oncale*, 523 U.S. at 81-82) (internal citations and quotation marks omitted).

Notably, "viable hostile work environment claims often involve repeated conduct. . . . because, 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Boyer-Liberto*, 786 F.3d at 277 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-17 (2002)). But, the "'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21) (other citations omitted). Moreover, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted); *see also Boyer-Liberto*, 786 F.3d at 294. But, workplace conduct is not necessarily discriminatory merely because certain words have a particular connotation. *Cf. Oncale*, 523 U.S. at 80. "Thus, complaints premised on nothing more than 'rude treatment by [coworkers]', 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII.'" *Sunbelt Rentals, Inc.*, 521 F.3d at 315-16 (internal citations omitted); *see Nnadozie*, 2018 WL 1830935, at *8.

The Court reiterated in *Boyer-Liberto*, 786 F.3d at 278 (citation omitted): "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *See also*, *e.g.*, *E.E.O.C. v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008)) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'"); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir.

2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

In *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325 (4th Cir. 2003), the Fourth Circuit determined that a reasonable jury could find that the plaintiff suffered harassment because of her sex when her male coworkers engaged in conduct that was "particularly offensive to women and was intended to provoke [the plaintiff's] reaction as a woman." *Id.* at 332. In particular, the Fourth Circuit emphasized the use of "'such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). The coworkers' language and conduct, for example, "portrayed women as sexually subordinate to men . . . [and] was also calculated to disturb [the plaintiff]." *Id. See also Smith*, 202 F.3d at 242 (holding that the plaintiff's allegations satisfied the second element of a sex-based hostile work environment claim when "[e]xplicit and derogatory references to women appear[ed] in virtually all of [the employer's] harassing remarks.").

In addition to the alleged conduct previously discussed, Grady's hostile work environment claim appears to rely on other incidents, including that Grady "was being harassed . . . when her computer showed a message [that] her files on C: drive was [sic] currently in use by another user," *id.* at 14, ¶ 14; a co-worker "harassed her by anonymously placing a [photo of a] bug in her office chair . . . [and] verbally attacked her and informed her he will do it again," *id.* at 14, ¶ 17; ECF 15-3 at 19; and Grady received an email "referring to her as 'bitch, and whore' which further stated 'we all hate and disrespect you every day.'" *Id.* at 14 ¶ 22.

In *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 772 (4th Cir. 1997), the Court said: "We have made clear that only harassment that occurs because of the victim's [protected class] is

actionable." Grady's Complaint alleged at least two incidents that relate to her protected classes of race and gender—the email referring to Grady as a "race card playing bitch" and "whore," ECF 1 at 14, ¶ 22; ECF 15-6 at 74, and the modification of Grady's computer to reference "NAE//: prayer ready." ECF 1 at 15, ¶ 26. The other alleged occurrences include the incident involving a photo of a bug, Grady's notifications that her computer files were in use by another user, and Williams's verbal reprimand and reference to Grady as a "trouble maker." Although it is not clear that the conduct pertains to protected status, I shall assume that Grady adequately demonstrated that the alleged incidents were "because of" her race, color, sex, or religion.

Even assuming that all of the alleged incidents occurred, and were premised on Grady's race, color, sex, or religion, Grady fails to establish a claim for a hostile work environment because the alleged incidents are too isolated, infrequent, and/or insignificant to amount to sufficiently severe or pervasive so as to alter the terms and conditions of Grady's employment, in violation of Title VII. Some of Grady's allegations, if true, are certainly inappropriate, but they do not reflect a workplace that is "permeated with discriminatory intimidation, ridicule, and insult." *Boyer-Liberto*, 786 F.3d at 281; *see Hartsell*, 123 F.3d at 777 (holding that the plaintiff failed to state a plausible claim when the plaintiff's claims "[we]re so trivial, so isolated, and so far from the paradigmatic case of sexual harassment, that summary judgment was clearly appropriate").

In *Spriggs*, 242 F.3d at 184, the Fourth Circuit considered the plaintiff's hostile work environment claim based on the plaintiff's "expos[ure] on a 'continuous daily' basis to [his supervisor's] racist comments concerning African Americans . . . ." Concluding that a reasonable jury could find that the plaintiff endured a hostile work environment, the Fourth Circuit noted that the supervisor's "frequent and highly repugnant insults" included the constant

use of unambiguously racial epithets, as well as degrading and humiliating comparisons of plaintiff's physical appearance to a "monkey." *Id.* at 185. The supervisor's "incessant racial invective" against the plaintiff also included the supervisor's placement of a picture of a monkey inside the manual regularly used by the plaintiff. *Id.* at 182, 186.

Unlike the plaintiff in *Spriggs*, the incidents alleged by Grady are sporadic and infrequent, rather than constant and incessant. For example, Grady alleged that, during the course of 2014, she experienced the anonymous placement of a photo of a bug on her chair, her supervisor's verbal reprimand and reference to her as a "trouble maker," the receipt of an email from a coworker, referring to her as a "bitch" and whore," and the modification of her computer to reference "NAE//: prayer ready." ECF 1 at 14-15. In contrast to the constant and daily use of racial epithets in *Spriggs*, the instant case alleges only a handful of rude comments, immature and insensitive conduct, and unpleasant incidents and utterances.

Accordingly, I conclude that Grady failed to allege a plausible claim for hostile work environment under Title VII.

### E. Retaliation

The Department also contends that Grady's retaliation claim is without merit. ECF 15-1 at 19-23. At issue here is whether the Department retaliated against Grady for filing her 2008 EEO Complaint. First, the Department argues that Grady has not shown that she suffered an adverse employment action. Second, the Department contends that Grady cannot show a causal connection between her protected activity and any alleged adverse employment action.

"The elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Coleman*, 626 F.3d at 190 (citing *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004)). *See Boyer-Liberto*, 786 F.3d at 281 (Title VII and § 1981); *see*

*also Stennis v. Bowie State Univ.*, 716 Fed. App'x 164, 166 (4th Cir. 2017) (per curiam) (Title VII); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016) (Title VII and § 1981); *Love–Lane,* 355 F.3d at 786 (§ 1981); *Easley v. Bd. of Educ. of Prince George's Cty.*, No. 8:12-CV-02277-AW, 2012 WL 5829122, at *2 (D. Md. Nov. 15, 2012) (§ 504); *A Society Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001).

In a retaliation claim, "a 'protected activity' may fall into two categories[:] opposition and participation." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceedings under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259. "To fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass formal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted).

As to the first element, there is no dispute that Grady engaged in protected activities. *See* ECF 15-1 at 19. Rather, the instant motion turns on the second and third elements, *i.e.*, whether Grady suffered an adverse employment action and whether the allegations are sufficient to establish a causal link between the protected activities and the adverse employment action. *See Boyer-Liberto*, 786 F.3d at 281.l

To satisfy the second element of a retaliation claim, the plaintiff must show that she suffered an adverse employment action. *See A Society Without A Name*, 655 F.3d at 350; *Booz-Allen & Hamilton, Inc.*, 368 F.3d at 375. Again, an adverse employment action is one that

"'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Ellerth*, 524 U.S. at 761). The plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Sante Fe Ry. Co.*, 548 U.S. at 68.

As to the third element, there must ordinarily be "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005); *Nnadozie*, 2018 WL 1830935, at *7. Thus, "[a] lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two." *Constantine*, 411 F.3d at 501 (internal quotation marks and citation omitted). Absent temporal proximity between the protected activity and alleged retaliation, the court "may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (internal quotation marks and citation omitted). Notably, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

In her Complaint, Grady alleges that the Department retaliated against her through a variety of measures, including: (1) Grady "received a hateful vulgar email on her government computer from Bert Rice <Callie Donaldson> referring to her as a 'bitch, and whore' which further stated 'we all hate and disrespect you every day,'" ECF 1 at 14, ¶ 22; (2) Grady's supervisors "failed to award and respond to her inquiries regarding numerous innovative ideas

submitted by [Grady] but utilized the ideas," *id.* at 14, ¶ 23; (3) Grady's supervisors "failed to resolve ongoing systemic computer issues that has hindered [Grady] with regards to assignments." *Id.* at 15, ¶ 25; (4) Grady's computer was modified to reference "NAE//: prayer ready." *Id.* at 15, ¶ 26; (5) Grady's supervisor "referred to [Grady] as a 'trouble maker and advised other engineers to stay away from her.'" *Id.* at 15, ¶ 27; (6) Grady's supervisor "gave her a lower performance appraisal rating her a '2.'" *Id.* at 15, ¶ 28; (7) Grady's supervisor "t[ook] her project away after reporting excessive overhead and profit for a project." *Id.* at 15, ¶ 29; and (8) the Agency "placed [Grady] under investigation for allegedly falsifying labor hours." *Id.* at 15, ¶ 30.

**i.**

As to Grady's receipt of a "hateful vulgar email," the email did not constitute an adverse employment action for Title VII purposes. As an initial matter, it is unclear from the record who sent the email or whether the sender was even an employee of the Agency. Even assuming that the email was sent by one of Grady's supervisors, however, there is no evidence that the email actually affected the terms or conditions of Grady's employment in any way, or that the email would have dissuaded a reasonable person from making or supporting a complaint of discrimination. *See, e.g.*, *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 189 (4th Cir. 2004) (holding that no adverse employment action resulted from the plaintiff "being excluded from certain meetings and emails," receiving a "negative employment evaluation," or "the fact that he was ostracized by certain employees").

For the same reasons, Grady's allegations that her supervisors failed to resolve her computer issues, discussed *supra*, or that her coworkers modified her computer to reference "NAE//: prayer ready," simply do not rise to the level of an adverse employment action.

Accordingly, this Court must dismiss Grady's retaliation claims regarding the email, her supervisors' failure to resolve her computer difficulties, and the modification of her computer.

**ii.**

Grady complains that her supervisors failed to reward her for the submission of project ideas to the Agency's Employee Innovation Program. ECF 1 at 14, ¶ 23. Grady has not alleged or established that such awards were mandatory, rather than discretionary, or that such awards were part of her compensation program. Moreover, Grady does not allege that the Department's failure to confer an award was accompanied by a decrease in Grady's pay or any other lasting consequence. But, in the 2014 EEO Complaint, Grady stated that, because of the Agency's failure to award Grady for her ideas, she suffered "[a]dded stress, humiliation, lack of enjoyment of life, worth of selflessness, low employee morale [and] Tension headaches." ECF 15-3 at 18.

"As a matter of law, . . . the non-receipt of a discretionary bonus does not constitute an adverse employment action." *Schamann v. O'Keefe*, 314 F. Supp. 2d 515, 531 (D. Md. 2004) (citing *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996)). In any event, the denial of a single bonus has only a minor effect, and when unaccompanied by a more lasting consequence, such as a salary cut or reduction in paygrade, it does not significantly modify the terms or conditions of employment. *See Floyd v. U.S. Dep't of Homeland Sec.*, Civil Action No. RDB-09-0735, 2009 WL 3614830, at *6 (D. Md. Oct. 27, 2009) (holding that the loss of a bonus, *inter alia*, does not significantly alter the terms or conditions of one's employment); *McClintick v. Leavitt*, Civil Action No. RDB-05-2880, 2007 WL 927616, at *5 (D. Md. Mar. 26, 2007) (recognizing that the denial of a bonus is not an adverse employment action, in contrast to a quality step increase that would permanently modify the pay scale).

**iii.**

Grady alleges that she suffered an adverse employment action when she received a performance evaluation of "two, fully successful." ECF 1 at 14, ¶ 16; *see* ECF 15-6 at 46 ("On December 23, 2014, Williams gave [Grady] a rating of two, fully successful on her performance appraisal.").

"A 'downgrade of a performance evaluation *could* effect a term, condition, or benefit of employment' if it has a tangible effect on the terms or conditions of employment." *Booz-Allen & Hamilton, Inc.*, 368 F.3d at 377 (citation omitted). A lower performance evaluation, however, "'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" *Id.* (quoting *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000)); *see also Melendez v. Bd. of Educ. for Montgomery Cty.*, 711 F. App'x 685, 688 (4th Cir. 2017) ("Reprimands and poor performance evaluations alone 'are much less likely to involve adverse employment actions than the transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent.'") (quoting *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015)).

Grady does not allege that a rating of "two" had any tangible effect on the terms, conditions, or benefits of her employment with the Agency. Nor has Grady alleged that she suffered any actual consequences as a result of her lower rating. Rather, Grady's performance evaluation seems generally positive and characterizes her performance as "fully successful." *See* ECF 15-6 at 46.

But even assuming that Grady's lower performance evaluation did constitute an adverse employment action, Grady cannot show that there is a causal connection between her 2008 EEO Complaint and her 2014 performance evaluation. The six-year time lapse between the protected

activity and alleged adverse employment action negates any inference of causal connection. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (holding that a three-year time lapse between the protected activity and alleged adverse employment action was too long to establish the third element of a causal connection); *see also Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) ("A thirteen month interval between the [EEO] charge and [adverse employment action] is too long to establish causation absent other evidence of retaliation.").

### iv.

Grady alleges that the Department retaliated against her by reassigning her project to another employee without providing an explanation or warning. ECF 1 at 15 ¶ 29; *see also* ECF 15-3 at 31-32. Absent any "significant detrimental effect," such as demotion, decrease in pay or benefits, or reduced opportunities for promotion, the reassignment of Grady's project cannot constitute an adverse employment action for Title VII purposes. *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999).

"[N]ot everything that makes an employee unhappy is actionable adverse action." *Settle v. Baltimore Cty.*, 34 F. Supp. 2d 969, 989 (D. Md. 1999). There is no allegation that suggests that Grady suffered any significant detrimental effect as a result of the project reassignment. *See Thorn v. Sebelius*, 766 F. Supp. 2d 585, 599 (D. Md. 2011) (finding that changes in assignments and duties, including "shifting many of [the plaintiff's] duties to other people and not including him on the design team," did not constitute an adverse employment action in the absence of any tangible effect on the terms and conditions of employment).

### v.

Finally, the Department's investigation of Grady for allegedly falsifying her work hours is not an adverse employment action. "[T]erms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from a state agency's disciplinary procedures." *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001), *abrogated by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

In *Von Gunten*, 243 F.3d at 869 the Fourth Circuit concluded that no adverse employment action took place after the plaintiff's supervisors "began 'hyper-scrutinizing' her sick leave, informing her that she needed to provide documentation for all prior and future sick leave," and placed the plaintiff on administrative leave during the course of the investigation. In doing so, the Fourth Circuit also noted that the employer's "demands that [the plaintiff] comply with sick leave policy" had not adversely affected the plaintiff's employment. *Id.*

Similarly, Grady cannot claim exemption from the Department's disciplinary procedures. Moreover, Grady has not alleged that the Department's investigation adversely affected the terms or conditions of her employment. Accordingly, the Agency's investigation of Grady cannot constitute an adverse employment action.

## F. Unequal Pay

In her Complaint, Grady alleges a claim for disparate pay under Title VII, on the basis of her sex/gender. Specifically, Grady contends that the Agency paid her at a lower rate than it paid male engineers. ECF 1 at 15 ¶ 32.

To establish a *prima facie* case of wage discrimination under Title VII, the plaintiff must show that: "(1) she is a member of a protected class; (2) she was paid less than an employee outside the class; and (3) the higher paid employee was performing a substantially similar job."

*Kess v. Mun. Emps. Credit Union of Baltimore, Inc.*, 319 F. Supp. 2d 637, 644 (D. Md. 2004); *see also Siraj v. Hermitage in N. Va.*, 51 F. App'x 102, 112-13 (4th Cir. 2002); *Brinkley-Obu*, 36 F.3d at 343.

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action." *Hoyle*, 650 F.3d at 336; *see Reeves*, 530 U.S. at 142. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 253. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of the evidence, "that the [employer's] proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [the plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action,"

then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509. This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see also Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As discussed, there is no dispute that Grady is a member of a protected class. Moreover, the Department apparently does not dispute that Grady was paid less than the male engineers performing substantially similar work. ECF 15-6 at 12-13. However, the Department established a legitimate, non-discriminatory reason by "cit[ing] its rationale for any difference in pay being that [Grady] and some of these engineers had not been employed by the Agency for the same length of time." *Id.* at 12. Grady has not proffered any evidence or argument at all to rebut the Department's legitimate, non-discriminatory explanation for any disparities in pay. Thus, Grady has failed to establish pretext, as required to support her claim. *See Celotex*, 477 U.S. at 322-23 ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Grady has not met this standard. Therefore, summary judgment will be granted in favor of the Department with respect to Grady's disparate pay claim.

## G. Rehabilitation Act

Grady asserts claims under the Rehabilitation Act. Section 504 provides, 29 U.S.C. § 794(a): "No otherwise qualified individual with a disability ... shall, solely by reason of her or

his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." The Fourth Circuit has held that "to establish a violation of section 504, plaintiffs must prove that they have been discriminated against—that they were excluded from the employment or benefit due to discrimination solely on the basis of the disability." *Sellers v. Sch. Bd. of City of Manassas,* 141 F.3d 524, 528 (4th Cir. 1998) (citations and internal quotation marks omitted).

To establish a *prima facie* violation of the Rehabilitation Act, the plaintiff must show: "(1) that [s]he has a disability; (2) that [s]he is otherwise qualified for the employment or benefit in question; and (3) that [s]he was excluded from the employment or benefit due to discrimination solely on the basis of the disability." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995) (citing *Gates v. Rowland*, 39 F.3d 1439, 1445 (9th Cir. 1994)).

Grady has failed entirely to allege that she has a disability. Accordingly, Grady's claims under the Rehabilitation Act are subject to dismissal.

## IV.    Conclusion

For the reasons set forth above, this Court will GRANT Defendant's Motion. ECF 15. A separate Order follows.


Dated: June 22, 2018                                    _____/s/_____
                                                        Ellen L. Hollander
                                                        United States District Judge